Your Honor, I'm John Henderson. I represent Wassily Roberts, a Yupik Eskimo, 69 years old. And the case is about a Native allotment. I'd like to just raise some points going over the briefs. I know you've read them. We did not oppose Keacher Hawk, that's the village corporation, motion for dismissal once the U.S. had decided their side of the case. Because we agreed that without the U.S. in the case, the jurisdiction would be in the state court rather than federal court. And that's the reason. It was raised in the brief to some extent. We have a due process claim. It has to do with how the hearing was conducted. We didn't know at the time the hearing was going on and didn't know for some time after. That the hearing officer was on probation and her decisions were being supervised and to some extent written by other persons. We think we should have known that information to determine whether we should have objected and asked for a hearing officer that was not under special probation and supervision. You have to win on one of your other points to make that prejudicial, don't you? You have to. In other words, the government saying, well, we no longer have this tract of land. It's not ours. I think that's true. The hearing becomes kind of irrelevant. Well, if they win on some other point. Yes, that's definitely true. You're right. So, yeah, I'd like to note that moving top filed applications is common BLM. In fact, there's a statute about it and it's cited by both parties in our briefs. And basically the field examiner has to figure out how he can get to conflicting legalized so that it's beneficial to both parties. And in this case, ultimately, the land description was written by Dwight Holland, who was a field examiner for BLM. And he's the one that knows how to write land descriptions. And Mr. Roberts never wrote a land description in his life. He has a third grade education and he simply doesn't understand it. I practiced for years now and block and block. I can handle that. But some of the more complex ones are difficult for me. In any event, Dwight Holland, when he came out to good news, did the logical thing. And he said, we've got this helicopter here. Take me to where your allotment is. And so we took him to the allotment place. And that was the favorite place to fish. And sure enough, it turned out that on the map they had, Mr. Holland said, I'm sorry. This is Ina Chamberlain's place. We can't do it here. We've got to move this around a little bit. And so as I understand it, there was not a lot of testimony about this at all. But he moved the allotment upstream so he was near the same fishing area. And that's where he drew the description. And the description was drafted by Mr. Holland. So Mr. Roberts never drafted any land description. And the confusion that happened here resulted because an attorney by the name of Monica, who was with Rural Catholic Relief, contacted Mr. Roberts when he was visiting family in Quinhag and said, gee, it looks like you're top-filed on Ina Chamberlain. Where's your next best place? So Bosley tried to describe that to her and told her. And it was on the river. And it wound up, I don't know how it happened, but she wrote a description that put the land on the side of the mountain, on the south fork of the Good News River, which is very seldom used. It's very shallow. It's a short tributary. It's not a place that a person would go to do subsistence fishing. But anyway, it wound up there. And that's how BLM finally put the conveyance, or his allotment, in a different spot. And my understanding that a native's allotment is the place where he actually went and did fishing and berry picking and things like that. And that's what Mr. Roberts showed to Mr. Holland. And there's a lot of conversation in our briefs about you can't change a description once you have a description. I think I've frequently seen it and have prepared correction deeds when there's an incorrect description of real property. It's our contention that it was the intent of the Bureau of Land Management when it issued the interim conveyances to protect Wesley Roberts' native allotment because they said parcel D is accepted. And they put a whole lot of other people's parcels in there. And they put the parcel number in there. And so clearly BLM was not trying to convey this property that Wesley used for subsistence to another party. If they did, they wouldn't have had the exception in there. They simply were going off monotous description. I'm having some trouble getting my hands around this. It does seem, you know, in a way he fell between the cracks because of the legal services attorney. That's the best I can figure out given the timing of his choices. And, you know, he doesn't get his first choice because that's top file. And so ultimately ends up with his, I guess, his second best choice. Yeah. Once we get over the fact that the misdescribed name was on this unusable, non-accessible, non-official piece of property. Could you address, however, given the timing of this and his original parcel D that he selected, why any bar litigation wouldn't preclude him from now suing the government over this? Why through no fault of his, surely, the land had already been conveyed. But I'm trying to figure out legally, you know, what theory in this court could be used to give it back to him. And I'm not sure what that is. Well, I think that procedurally, because Mr. Holland and the people that worked with him went ahead and found that Vossley was qualified. And in their files, they said you're qualified, sent notices out to him. And then after that went through quite a procedure with something called a reaffirmation of title. And whereas Keisha Hawkins said originally, hey, we support you in getting your allotment and building a fish camp on it, then they reversed themselves. And I guess the question is, what legal obligation did they have not to reverse themselves? Well, they had certainly led both Mr. Roberts and my client at that time was Alaska River Safari. And they spent thousands of dollars building this camp. And it was right where everybody could see it. I mean, if you went up the river, there it is. It's on the right bank going up the Good News River. And it certainly, you know, caused a large amount of money to be spent. And then secondly, Mr. Roberts was getting the lease payments to help keep his family alive. That was, you know, he was getting older. He's not commercial fishing anymore. Is this, again, I'm trying to get back to the legal ground for your claim. Is it essentially an estoppel claim, not against the government? Well, I think it's an estoppel claim. It's against Keisha Hawkins. If we were to be in a courthouse today with a live case against us, that's what it would be. Did you ever file that case against Keisha Hawkins? No. I did not. Not only you, but Mr. Roberts or someone on his behalf. Well, there was another case filed by another lawyer that involved the present sport fishing organization known as Good News River Lodge. But that case has been dismissed. Let's see. Going back to, well, procedurally, it's our contention that he alone should have issued that certificate of allotment. And they should have ignored Keisha Hawks' refusal to sign this reaffirmation of title. As they'd already accepted that plot under conveyance, so Keisha Hawks couldn't have title. There was no intent on the part of the government to convey it to them. And without intent, you don't have a lawful conveyance. But if the government doesn't. So you're saying, because under the quiet title, government doesn't have the property, so you don't really have any jurisdiction to sue them under that act. But you're just saying somehow. No, the government does have the property. Because they've accepted it's merely an error in description caused by the legal services attorney. The government still holds in trust, even before the native might sign an allotment application, or immediately thereafter. They're holding that land in trust. And there's just many of them. Because there's nobody there to write a proper description that aren't in the exact right place. And you get them in the right place once the survey happens. But I mean, this is 400 miles from here. The shore of the Bering Sea. There isn't much sophistication. Having a nice post office. That's one of the top things in town. Or a small church. But in any event, everybody that went up and down the river knew where this allotment was. Because they could see the Alaska River is building this king. And it's white in color. And there are a few substantial boats there. And it's walkways. I mean, there's no question where it is physically. And everybody was told and knew it was being built on Wassily's property. Wassily started using the property in 1956. His prove up period ended in 1961. That's two years before I came to Alaska. I think just because the result we have here is because Ketra Haug gets two 40-acre parcels now. And Wassily's short one 48-acre parcel. Without any objection, his other three parcels were approved. And those other three parcels are one for waterfowl hunting at the lagoon. One for seal hunting on the coast. And one for moose hunting and lake trout up at Goodman's Lake. The one he's missing is deep. And that's the only one I'm subjected to. This allotment site was actually where Roberts and his father had fished before he was over 21. The solicitor had actually approved of this allotment. And that was why he got that affirmation title together. And sent Mary Jim out to get it signed. Sent her out there two or three times. I might point out that during this period of time, just as this started a lot, BIA issued an interim use permit to Alaska Riverside Park. So it was clear then, and that's 1986 or 7, that they thought that they had title and trust for Wassily as they were acting for him. Do I have anything more at this time? Thank you. Thank you. May it please the court. I'm Catherine Barton. I'm with the Justice Department. Sitting with me at council table is Dean Dennis Moore, also from the Justice Department, who handled the case in trial court. Mr. John Starkey is with Quijac, the native village corporation, and will present five minutes of argument, or whatever is necessary, after I finish. As outlined in our briefs, we believe there are two failures in Mr. Roberts' claim here. Threshold matters. One is the basis on which the district court decided, which was that he waived his right to sue the United States in exactly these circumstances when he signed the Fannie Bar Waiver and participated in the Fannie Bar Settlement, which, absent the settlement, he would not have gotten 120 acres that he was able to get. So it was that participation in the settlement that allowed him to get the three parcels he did, but not this one. Well, the waiver says that you can't sue the United States on the ground that it's been given to somebody else. Yes. And his argument, as I understand it, is, well, it hasn't been given to somebody else. Right. Everybody knew where it was, and there was just a misdescription, and somebody could correct it. Well, right. He has two arguments. One is that BLM didn't intend to transfer that parcel, his intended parcel D, his second-choice fishing hole, when it conveyed the lands to Kujak. But all that BLM knew at the time, the only information it had, was the land that was identified in the application. And it is unambiguously clear in the transfer document that it was the land in the application that was excluded from the conveyance. And there's no question of intent here. That is what happened in the conveyance. It's absolutely clear. BLM, the description wasn't changed until 86, and the property wasn't surveyed until 89. So the intent argument just fails. It's really immaterial. Then he has an argument that this was the land that he intended to, that because the parcel that he really wanted was the parcel that he had used, there's some sort of right to that that would have excluded it. Now, there's three problems with that argument. One is that, I think he's basically saying, the transfer to Kujak was subject to valid existing rights. He's basically saying they had a valid existing right. I think he's saying that, in effect, the department held it in trust for him. They knew that it was his, and they had notice, and therefore they held it in trust, and therefore that's a valid existing right. Well, this, I mean, there is no, there's, he didn't know, and there's no, there's not notice. I mean, this happened in 84, and all they have is the family bar application. So, I think he's not, he's, there's definitely no allegations, even, that BLM knew, just that sort of despite knowing they had a right. And, first of all, BLM found in the hearing, the subsequent hearing, the Agobar hearing, that Wassily Roberts did not establish sufficient use and occupancy of the parcel to qualify for an allotment to that parcel. I mean, that goes to, that's what they're collaterally attacking in this case, I believe, although they don't ever challenge that finding. So, under that, I mean, they haven't even shown that they had a valid existing right. I mean, it presumes something that BLM found the opposite of, and they haven't directly challenged here. Also, when something is, when land is conveyed subject to a valid existing right, and it is still conveyed, the transfer, there's an IPLA decision called Thorson, that the land is still transferred, this still constitutes a transfer. And this is the very kind of situation that the family bar settlement intended to address. Because if every family bar applicant could come into court and say, well, no, it wasn't reconveyed because we had a right to it anyway, the family bar settlement would be meaningless. I mean, it was, when we agreed to the family bar settlement, what the Department of the Interior was concerned about was this additional 400 applications being deemed timely and coming into the family bar, into the allotment application system, and causing all kinds of uncertainties in the process. Well, this is, the allotment provisions, the Alaska Native Claims Settlement set up a whole variety of kinds of transfers, transfers to village corporations, to regional corporations, to the state. All this was going on, and the allotments created an uncertainty. There's more uncertainty in the system when you have these allotments coming in late into the system about whether any transfer is valid and what is transferred. So that's exactly what we're concerned about. We agreed to the family bar settlement, fairness to people who had made a good faith effort to get their applications on time, but fairness and predictability and speed, as directed by Congress, in the transfers to all the other parties. That's exactly why we have the set, you can't, the condition for the settlement is that you can't challenge where there's already been a conveyance. So this valid existing rights argument is just a circular argument that gets to exactly why we, what the family bar process precludes, what the family bar waiver precludes. And I would like to note that the, if that, that our other argument is right and valid, that he didn't even submit a family bar application. The United States, in agreeing to the family bar process, agreed to deem the original applications timely filed. The deadline for the applications was in 1971. The United States couldn't change that statutory deadline. It's a statutory deadline. All it could do was deem the applications to be timely filed as of 1971. Thus, when Roberts, when Mr. Roberts submitted an application with a different parcel D, that constituted a different application. That's not his original application that was deemed to be timely filed. And so it was a different application for parcel D filed in 1982, and it's filed on time. He says that the other statute related to relations back for filing somehow should be figured in. No, there are two provisions that, one that they rely on, one that the court relied on. One is for amendments. Right. That amendments may be made. And that's, that provision is very clear, that the amendment process allows for changing the description, an erroneous description of a parcel. And that's not what happened here. He changed his choice. He made a different choice of the parcel. And the other provision is a provision allowing the secretary to make adjustments for overlapping parcels. That might be what would have happened if he had filed, if he had submitted his original application. If it was D filed because it was hot filed, he said over somebody else, and the attorney told him he could choose another one, which was wrong. But the secretary would have adjusted the rights of those determining who had use of occupancy and what would have happened. But that's not what happened here either. He chose an entirely different parcel. There was no secretarial process. So it's not even, it's just an out of time application with respect to parcel B. And I don't think I have anything else unless there are questions from the court. Thank you. May it please the court. I'm John Sky Starkey and I represent Quijack, which is actually the right way to pronounce the native corporation's name in this case. Quijack is a native village corporation. This is not a regional corporation. This is a corporation that was designated in the Alaska Native Claims Settlement Act to select lands for the native village of Good News Bay, which has been there for thousands of years. It's a small village. At the time of the Claims Act, it was 200 to 300 people, which allowed them an allocation of 115,000 acres to be selected from town sites that are the core township is where the village is located. Select the surrounding townships around the village. You may select from that to fulfill your allotment of 115,000 acres. And Congress designated this selection process for village corporations primarily to allow them to have customary traditional hunting and fishing areas reserved to the village corporation. The other scheme was to allow regional corporations, 13 of them, pretty much along cultural linguistic lines, to select additional lands for economic purposes. And the regional corporations would then also have subsurface rights to the lands selected by the village corporations. So this is as close... Congress chose not to do reservations and recognize tribal authorities, etc. but they put in these village corporations in place and not to completely displace the idea that local tribal village people would have land for subsistence uses, but just a different way to choose it. And this is the way it remains in Good News Bay. It's still a small village. All the board of directors are tribal members who live in the village of this corporation. And they chose the land for subsistence uses and they use them for subsistence uses. It's still a subsistence village. The Allotment Act and ANCSA strive for balance. The Allotment Act is to allow individual natives to have a parcel of land originally because there was no reservation system and they needed protection for their home sites, campsites, subsistence sites, etc. When ANCSA came in, Congress chose to extinguish the Allotment Act because they were going to settle all the land claims and they were going to allow the village corporation to select these sites and these subsistence areas for the use in common of the tribe, of the people of the village. So the village corporation looks at this case now as protecting the communal use of the subsistence lands for the village. What you don't see in this case, but what you will see in the district court's opinion several times is its remark that what's not challenged here is the finding of the BLM hearing officer that there was no evidence, not enough evidence of substantial use of this allotment. That he simply did not prove that this was his subsistence site. This sort of makes sense. He acknowledges in the pleadings that his first selection, his favorite fishing hole was a place where he decided to abandon because it was top file. Well, if you have to have substantial use of an area, how many fishing holes can you have where there's substantial use? It's a big business to subsistence fish. You have to put up drawing racks. You need a smokehouse often. It's not just like you cast your line in the water and pull out a couple of hooks when you're depending on them to feed yourself for the winter. So you need a lot. So it makes sense. Hussarik Twijak did not find out, had no official notice, that he changed his allotment until 1990. By law, they were allowed 60 days after receiving that notice, and it's in the record. It's in the excerpts of records, supplemental excerpts of record. They got the notice. They filed the protest. It's not common in Alaska for a village corporation to file a protest against a member in terms of getting an allotment. But in this case, he simply had not had substantial use. They filed a protest. They had the hearing. A lot of people presented evidence. It's referred to in the IPLA decision that you have before you that the hearing officer did not find substantial use, and he was denied the allotment. The corporation was trying to protect the communal use of this property for its subsistence hunting and fishing opportunities. ANCSA did allow a provision that Mr. Roberts could try to avail himself of. In Section 14C of ANCSA, there's a provision that allows subsistence campsites. So there's a balance here, the balance that was trying to be struck throughout all the law and the Fannie Barr waiver was how to balance the desire and the need of a village corporation to have the security in their land title and what they need to do to conduct business and an allottee. And so Fannie Barr struck it. Well, listen, if it's been conveyed, then, you know, we're not going to go back after the corporation and try to, you know, make them give you back title. The fact of the matter is that many village corporations, if they see that there's been a mistake and they acknowledge that this is where the campsite is, and it's well known, the river in Good News Bay, it's like how well do you know the street between where you go, where your neighborhood is and where the store is? There's no roads. They know the river. People have had subsistence campsites that have been there for generations. People know, you know, what's going on on the river. And so people understood. In most cases, if there's a mistake and people acknowledge it, yeah, the title. They ask for a title affirmation. Title's changed. It all goes through. There's not a problem. This all sounds reasonable, but if they all know, why did they originally say, yes, we will. We will. I mean, there's a lot that will convey it back. Because, Your Honor, the the land that was described to them all along was the site that was the second amended. This is the second amended. He amended it three times. It changes. This lot in the floated three times. The first time, when he originally applied for the Fatty Bar decision, you know, his waiver and his application to the court after Fatty Bar, which he swore to, the lot was located in a different section. Then he changed it when, you know, a few months later when he found out that he was top filed. And, by the way, Your Honor, top filing, it all makes sense. I mean, there's good fishing spots. And so a lot of the fish camps are grouped together. And, you know, a fish camp doesn't take 40 acres. You know, they're small, generally. It's just that. He could have left it in place, but his second amendment then was a different place. It was a different place. And so that place, that, the village corporation didn't receive notice when the helicopter came out and he said, well, it's here. I mean, people didn't know that. People aren't sitting there. You know, they didn't know that he changed the location. And, in fact, Your Honor, there's a lot of allegations in this brief, which we would very much take exception to except this, you know, this case came before your motion to dismiss. And so the facts are accepted as alleged. But there is a piece of paper out there, which is the interim, which is the supposed lease that's referred to in this case a lot that was the permitted, interim permitted lease that BIA gave to the sports fishing lodge to go out and look and see if Mr. Roberts' allotment was suitable for building the lodge. In fact, the property description, and this is either 88 or 89, on that piece of paper is the second, not the last description, but the second description. So as far as the village knew, he was back on the second allotment. The only time that they got actual notice. They wanted the mountain? Well, Your Honor, there's a mountain there. That's true. There's also a lot of allotments there. But in any event, it's not the one they wanted. He said that's a mistake by the attorney. That's what he says. Correct. But I guess in answer to your question, the village corporation really had no notice until the sports fishing lodge started moving in and putting up stuff in 1989 or so on the allotment. And then it took them a while to figure out what's going on here. Oh, well, this is where Roberts thinks he's got his allotment. Well, we don't think so. This has been a place where we've all used forever. And we're going to protest. So, anyway, Your Honor, Top Folly makes sense in a way, because a lot of people fish together. They top folly together. The secretary takes a look at it, sees there's a lot of fish camp there. He buys it. Maybe everybody didn't get 40, but they all get the original fish camp site. It all makes sense. And that's why the law makes sense. The law says you could, you know, Congress passed that when they passed the NOCA, they wanted to legislatively approve all these allotments. And so they said we're going to do that. But we're going to let the village corporation protest, which they did, and we're also going to require that if you amend your allotment, it has to be the original spot. And if it's top folly, then the secretary's going to work it out. And it all makes sense, because your original application would be where your fishing spot was. And if you top folly, there's generally room for the secretary to be able to work it out, because people can have, basically, because it's a traditional pattern, people already have all their fish camps in place. The secretary takes a look at that traditional pattern, and he allots the land so that everybody can continue the traditional pattern of having a fish camp where it was. The law makes sense, and there's just no legal basis here to disturb the law that makes sense for this allotment. Thank you, Your Honor. Thank you. Thank you, Your Honor. Mr. Roberts has never even been to the land that Monica, the first attorney, described. And so it's clear that that wasn't his intent. And there's day and night difference in the opinion written by the BLM. And it's obvious, when you read that opinion, that it had more than one writer. It had two writers, and one, obviously, with legal skills. And the opinion also takes note of the fact that Mrs. Roberts couldn't describe how to get to the allotment. If the person writing had been at the hearing and asked the question, they would have found out that, much like happens in other parts of the world, most of the ladies, when they get in the boat, sit down and they don't like running their face into the wind at 25 miles an hour or 30, and so they turn around. If their children are with them, they can talk with them. When your face is in the wind, you can't do that. So there's substantial differences, and we would, even today, like to know who actually wrote the second part of the decision. No one knows what description was in the first application because it was lost, and we don't have a copy. And I'd note that the government itself wrote the last description with Mr. Holland. I think those are the only notes I have here, and I do agree with Mr. Starkey that the department tries to solve top violence, and that's what Mr. Holland did. He moved up the river 100, 200 yards to try to solve that top violence. Thank you. All right, that'll stand submitted. Thank you.
judges: Pregerson, Canby, McKeown